### WILKIN v. KEITH.

1. TAX SALES—DESCRIPTION OF LANDS—SUFFICIENCY.

   A description of land, in a proceeding to enforce the collection of delinquent taxes, as situate in "H.'s plat of the city of S.," is sufficient, though it is situated in what the records describe as "H.'s plat of East S.," the cities of S. and East S. having been consolidated.

2. SAME—AUDITOR GENERAL'S PETITION—TIME OF FILING—PUBLICATION—DESIGNATION OF NEWSPAPER.

   The filing of the auditor general's petition in a tax proceeding need not necessarily precede the designation by him, under section 63 of the tax law, of the newspaper in which the petition and order of hearing are to be published.

3. SAME—PUBLICATION IN SUPPLEMENT.

   Publication of notice of a tax sale in a supplement to a newspaper is a sufficient publication in the newspaper. *Mann v. Carson*, 120 Mich. 631, followed.

4. SAME—VALIDITY OF DECREE—COLLATERAL ATTACK.

   A decree for the sale of land for taxes cannot be attacked, in a suit to set aside the deed issued thereunder, by testimony that the figures in the column of the tax record headed "Amount Decreed against Lands" were inserted by an employé in the county treasurer's office subsequent to the signing of the decree.[1]

5. SAME—SECOND DECREE.

   A valid decree in a tax proceeding may be substituted for a former decree which was prematurely entered.

6. SAME—IRREGULARITIES IN PROCEEDINGS.

   A tax sale is not void because there are no calendar entries in the proceeding, no entry of appearance or default, and no enrollment of the decree.

7. SAME—CONCLUSIVENESS OF DECREE.

   A valid decree in a tax proceeding forecloses defenses such as that the assessing officer did not assess mortgages, that the treasurer made no attempt to collect the tax, and that the amount levied was excessive.

---

[1] See, also, *Haven v. Owen, ante*, 51.

8. SAME—PURCHASE OF STATE LANDS—PAYMENT OF TAX LIENS.
   Section 84 of the tax law, making it a condition to a purchase
   of state tax land that there be payment of all taxes remain-
   ing a lien thereon, extends to taxes not yet returned by the
   collecting officer. *Hughes* v. *Jordan,* 118 Mich. 27, followed.

9. SAME—WHERE PAYMENT MADE.
   The payment in such case need not be to the local officer, how-
   ever, but an amount sufficient to cover the unpaid taxes may
   be deposited with the auditor general, thereby relieving the
   applicant from the risk of making a voluntary payment of
   another's taxes.

10. SAME—INSUFFICIENT APPLICATION—DEED—INTERVENING RIGHTS.
    An application to purchase state tax land, unaccompanied by
    an amount sufficient to pay all taxes then constituting a lien
    thereon, is not rendered effectual by the subsequent payment
    of such taxes by another, so as to authorize the after-execu-
    tion of a deed to the applicant, where there was in the mean-
    time another application to purchase the land.

11. SAME—REMEDIES.
    Where a deed of state tax land is denied to one entitled to it,
    and given to another, the former may maintain a bill to set
    the deed aside; the remedy by application to the auditor
    general for a certificate of error, prescribed by section 98 of
    the tax law, being exclusive only so far as it applies to sales
    in the original proceeding to declare the tax delinquent.

Appeal from Saginaw; Snow, J. Submitted February
6, 1899. Decided July 11, 1899.

Bill by Anna M. C. Wilkin against George Keith,
William Keith, and Roscoe D. Dix, auditor general, to set
aside a tax deed. From a decree for complainant, defend-
ants Keith appeal. Affirmed.

*Weadock & Purcell* (*McDonell & Hall,* of counsel),
for complainant.

*M. V. & R. A. Montgomery* (*Humphrey & Grant,* of
counsel), for appellants.

HOOKER, J. The complainant, a resident of New York,
was the owner of a mortgage of $15,000 upon premises in

Saginaw used for a hotel and store. In 1895 she foreclosed the mortgage in chancery, and purchased the property at foreclosure sale, the deed being recorded October 10, 1896. The property was sold to the State for the taxes of 1893 in December, 1895. In 1897 the auditor general deeded the title of the State to George Keith, who afterwards conveyed an interest to William Keith, his son. The bill is filed to set aside the auditor general's deed and remove the cloud from complainant's title, to compel the auditor general to refund to George Keith and his assign the amount received for said deed, and to issue to the complainant a certificate of error nullifying said deed. It prays, further, that it may be decreed that said premises have been redeemed by the complainant by the payment of certain moneys alleged to have been paid for her to the county treasurer upon the taxes of 1893, 1894, and 1895.

On January 26, 1897, Eugene Wood, of Lansing, called upon Mr. Weadock, complainant's solicitor in the foreclosure proceedings, at his office in Saginaw, with a list of delinquent lands subject to purchase, and stated that he wanted to interest Saginaw people in purchasing the same. He called to consult a map in the office, and, after doing so, went out with a Mr. Plummer, but they returned later, and directed Mr. Weadock's attention to the property in question, and stated that there was a large hotel on it, known as the "Aldine." Weadock informed Wood that he did not wish him to buy the property, for there was a mistake, or the taxes would have been paid, and told Wood that he was willing to pay him if he would retain his information until he (Weadock) could give the complainant a chance to pay them. Mr. Wood agreed to do this for $50, which Weadock promised to pay. On January 30th, complainant's brother received a draft, and went to the offices of the treasurers of Saginaw county and city, and discharged all taxes for the years 1893, 1894, 1895, and 1896, and took receipts therefor.

On January 28, 1897, George Keith, of Lansing, made application to the auditor general to purchase these prem-

ises.   At the same time he delivered to the auditor general two certificates of deposit issued by local banks, for $500 each, and a check for $10, made by the auditor general, all being by him properly indorsed.   On February 10th, Keith received a deed of the premises from the auditor general.   Keith obtained his information that the property was held by the State from one Hasse.   The bill was taken as confessed against the auditor general.   The Keiths answered.   The decree of the circuit court was in favor of the complainant, but required her to reimburse Keith.   Defendants Keith have appealed.

Numerous legal questions are raised upon the tax proceedings.   A number of them pertain to the regularity of the proceedings through which the State acquired its title. Some are jurisdictional, and some are not.   It is claimed that the land was not included in the petition or decree. This point involves a question of description.  The land in question is situate in what the records describe as "Hoyt's Plat of East Saginaw," while in the tax proceedings it is described as situate in "Hoyt's Plat of the City of Saginaw, according to the plat thereof."   The cities of Saginaw and East Saginaw, lying, respectively, upon the west and east sides of the Saginaw river, were consolidated some years ago under the name of Saginaw, since which time the name East Saginaw has been dropped, in tax proceedings relating to land east of the river, and the name Saginaw used.   It is claimed that this is misleading, but we are not impressed by the suggestion.   This description would be sufficient in a deed, and the owners of property on the east side cannot be supposed to be ignorant that there is no longer a city of East Saginaw.

It is said that the proceedings were void because the State held the title to this land under a purchase for the tax of 1892 when the petition was filed upon the tax of 1893.   This appears to be an error.   Our understanding is that the 1892 tax was paid on July 9, 1895.   The petition was dated September 12, 1895, and filed September 19th.   Both facts appear from the complainant's brief.

The order of publication was published in a supplement accompanying the regular edition of the Valley News, a newspaper published in Saginaw. The auditor general designated this paper as the one in which these proceedings should be published. In accordance with the practice of his office, he selected the papers throughout the State, and filed his order designating the same on June 26th. It is contended that this was premature, and that it could not lawfully be made before the petition was filed. We see nothing in the tax law that requires this construction, and the practice contended for would be an inconvenient one. In the case of *Mann* v. *Carson*, 120 Mich. 631, publication in a supplement was held to be a compliance with the law.

Counsel assert that the decree is shown to be void. This claim is based upon the testimony of a witness who said that he was employed in the county treasurer's office, and transferred or carried forward the amounts in column 13 of the tax record, which we understand to have contained the amount of taxes for which a decree was asked, to column 14, which was headed "Amount Decreed against Lands." He stated that he thought he did that work after November 19th, which was the date of the decree. Counsel urge that this was not the act of the circuit judge, and that there was no decree against this land justifying a sale.

We held in the recent case of *Morgan* v. *Tweddle*, 119 Mich. 350, that where the figures were extended by the county treasurer after the decree was signed and filed in his office, as is said to have been done in this case, the decree should, upon application, be vacated by the court which made it. That was a direct proceeding to set aside an irregular decree, and in such a case the rule that "a record is conclusive evidence of its own verity" is not applicable.

In *Trimble* v. *Longworth*, 13 Ohio St. 431, it was said that:

"The distinction between cases where the validity of the

record of a court of general jurisdiction is drawn in question collaterally, and those in which such record is directly impeached by writ of error or bill of review, is broad and well defined.    In the one case jurisdiction is presumed *prima facie,* unless the record disproves it, while in the other, if it is denied, its existence must be proved by the record itself."

In *Newcomb* v. *Dewey,* 27 Iowa, 381, it was held that, although a judgment recites that the defendant was " duly and legally served with notice," yet the contrary may be shown in a direct proceeding in the same court to vacate the judgment.    The judgment of a court of competent jurisdiction is always presumed to be right, and this presumption will prevail in a direct attack, unless the party alleging error shall show it.    See *McNeill* v. *Edie,* 24 Kan. 108; *Bond* v. *Wilson,* 8 Kan. 228 (12 Am. Rep. 466); *Chambers* v. *Bridge Manufactory,* 16 Kan. 270; *Harman* v. *City of Lynchburg,* 33 Grat. 37; *Wright* v. *Smith,* 81 Va. 777; *Jencks* v. *Smith,* 1 N. Y. 90; *Mc-Girk* v. *Chauvin,* 3 Mo. 236; *Singleton* v. *Boyle,* 4 Neb. 414; *Tebbetts* v. *Tilton,* 31 N. H. 273.

While a judgment may be impeached in a direct proceeding, it cannot be collaterally.    The decisions to this effect are numerous.    See 1 Black, Judgm. § 245, note 1. The author says (sections 245–247):

"Where the court has jurisdiction of the parties and the subject-matter in the particular case, its judgment, unless reversed or annulled in some proper proceeding, is not open to attack or impeachment, by parties or privies, in any collateral action or proceeding whatever.    'The doctrine of this court, and of all the courts of this country, is firmly established, that, if the court in which the proceedings took place had jurisdiction to render the judgment which it did, no error in its proceedings which did not affect the jurisdiction will render the proceeding void, nor can such errors be considered when the judgment is brought collaterally into question.'    *McGoon* v. *Scales,* 9 Wall. 30.    This principle is not merely an arbitrary rule of law, established by the courts, but it is a doctrine which is founded upon reason and the soundest principles of public policy.    'It is one,' says the court in Virginia,

'which has been adopted in the interest of the peace of
society and the permanent security of titles. If, after the
rendition of a judgment by a court of competent jurisdic-
tion, and after the period has elapsed when it becomes
irreversible for error, another court may, in another suit,
inquire into the irregularities or errors in such judgment,
there would be no end to litigation, and no fixed, estab-
lished rights. A judgment, though unreversed and irre-
versible, would no longer be a final adjudication of the
rights of litigants, but the starting point from which a
new litigation would spring up; acts of limitation would
become useless and nugatory; purchasers on the faith of
judicial process would find no protection; every right
established by a judgment would be insecure and uncer-
tain; and a cloud would rest upon every title.' *Lan-
caster* v. *Wilson*, 27 Grat. 629. If the sentence last
quoted seems somewhat extravagant, at least it will serve
to show the substantial reasons upon which the rule rests,
and the inflexibility with which it is held by the courts.
According to the supreme court of Massachusetts, the rule
obtains, 'not because of an apparent authority in the
court to render the judgment, but because the remedy by
review or writ of error is held to be more appropriate.'
*Hendrick* v. *Whittemore*, 105 Mass. 28.    *    *    *

   "The rule against collateral impeachment applies to
every judgment, order, decree, or judicial proceeding, of
whatever species, that is not absolutely void. If the
judgment is void on its face, it is, of course, a mere nul-
lity, and of no avail for any purpose, and this may be
urged against it whenever it is brought in question. But
otherwise, whether it be regular or irregular, correct or
erroneous, valid or voidable, it is not subject to collateral
attack. The rule has been held applicable to a judgment
*in rem*, where the court had jurisdiction of the *res;* to a
judgment condemning property in confiscation proceed-
ings; to decrees rendered by a court of equity, when
sought to be assailed in the same or another court; to a
judgment in attachment; to a decree confirming an audi-
tor's report on the distribution of the estate of an assignor
for the benefit of creditors; to a judgment forfeiting a
recognizance, that being within the competence of the
court; to an order passed by a superior court allowing a
certain sum to the clerk for costs in insolvent criminal
cases; to an order of court approving the act of an admin-
istrator in allowing a claim against the estate; to an order

granting an allowance for the support of the widow and children; to an order setting aside a judgment by default; to a decree vacating a former decree upon a petition to be let in to a defense. The entry of a judgment in the judgment book, it is said, including the date of the judgment and the date of the docketing in the judgment docket, while standing as part of the court's record, cannot be impeached collaterally. And while affidavits may be read, or proof heard, to show that words have been improperly stricken from a judgment, they cannot be received to falsify a record by showing that an alteration, correcting it, was improperly made.

"The principle that a record cannot be impeached collaterally for mere errors or irregularities is equally applicable to a statutory judgment against land for taxes as to any other decree. 'It is no objection,' said the supreme court of Alabama in a recent case, 'to the application of this principle, that the present is a proceeding to enforce the collection of delinquent taxes. While great accuracy is exacted in all such proceedings, and strict rules are applied for the protection of the taxpayer, this principle, forbidding the collateral assailment of judgments, has often been successfully invoked in actions of this nature. It has accordingly been decided that there is no sound reason why judicial proceedings for the enforcement of taxes should be exempted from its influence.' *Driggers* v. *Cassady,* 71 Ala. 533. Thus, the judgment cannot be impeached because it embraces also a personal judgment against the owner of the land besides the proper judgment against the land itself; for that part of the judgment which is directed against the owner will be regarded as mere surplusage. The cases even go to the length of holding that it cannot be shown against such a judgment, collaterally, that the taxes on the particular tract had been in fact paid before the suit, although delinquency is the very fact upon which the jurisdiction of the court must be based. And, in one State, tax judgments were sustained as valid and binding, although it was shown that the assessment on which they were based was illegal and void."

This rule applies to the record in this case. It was not competent for the complainant to attempt to impeach it by the parol testimony of its lawful custodian, and it must be held conclusive in this proceeding.

A decree was made on November 12th, and a later one on November 19th, under which the sale was made. It is evident that the latter was to take the place of the former, which was thought to be prematurely entered. A copy of the latter was attached to the tax record, and the sale under this decree has been confirmed.

It is said that no calendar entries appear in these proceedings, and that there is no evidence that there was a case pending, no appearance or default, no report of sale, and no enrollment. The decree was not void, and these questions are cut off by the provision of section 70, Act No. 206, Pub. Acts 1893, *i. e.*, that no sale shall be set aside after confirmation, except in cases where the taxes were paid or the property was exempt from taxation. *Spaulding* v. *O'Connor*, 119 Mich. 45; *Berkey* v. *Burchard*, Id. 101. The case of *Barnum* v. *Barnes*, 118 Mich. 264, settles the question of enrollment upon other grounds.

Several questions affecting proceedings anterior to the decree are cut off by the decree. One was that the assessor did not assess mortgages; another, that the treasurer made no attempt to collect the tax; and a third, that the amount levied, and for which the decree was rendered, was too large. These questions might have been raised before decree, if at all, but cannot be after. *Berkey* v. *Burchard*, *supra*.

Counsel claim that the deed from the auditor general to Keith should be set aside for the reason that the taxes were paid to the county treasurer before Keith made a valid application to the auditor general. Such payment was made on January 30th. It is urged that the application must be considered as made on the 10th of February, the date of the deed. The evidence shows that an application was made on January 28th. Counsel say that this was not good, because the number of the lot was not inserted at that time, and because money was not paid to the auditor general. We do not find proof that justifies us in saying that the number of the lot was inserted later,

and there is nothing to indicate that the auditor general did not accept the certificates and check, and that the money was not collected on them before the 30th. We cannot assume the contrary.

On January 28th, when Keith deposited his checks with the auditor general, it is said that there was an unpaid tax for the year 1896. It goes without saying that this tax had not been returned, for the roll was still in the hands of local authorities for collection, and the State, county, and city taxes on that roll were actually paid by the brother of the complainant on January 30, 1897, 10 days before Keith's deed was issued. The county treasurer remitted the amount due the State for the 1893 tax to the auditor general on January 30th, and he received it on February 2d. His letter, containing the remittance, stated that the later taxes, except those for 1896, were paid to the county treasurer, where they might lawfully be paid, and asked that a deed be made to the complainant. The auditor seems to have considered it his duty to issue the deed on February 10th to Keith, in disregard of this information, and without waiting for official evidence of its truth. This was probably upon the misconception of the law as to the current tax, as enunciated in *Hughes* v. *Jordan*, 118 Mich. 27. All that was ever paid by Keith was paid on the 28th of January. It is not claimed that he paid the taxes of 1896, but it is said that, inasmuch as they were actually paid, no matter by whom, before the deed was made, the amount previously paid in was sufficient, and the auditor had authority to make the sale and deed for the amount previously paid by Keith.

We have held in two cases (*Hughes* v. *Jordan*, 118 Mich. 27, and *Detroit, etc., Ins. Co.* v. *Wood*, Id. 31), that the condition to a purchase of state tax land is the payment of an amount including all taxes that remain a lien upon the land, and that this requirement (section 84) extends to current taxes, although not returned. It has been urged that this holding imposes hardships upon purchasers, by requiring them to pay current taxes, thereby incurring the hazard

of having some other person purchase the lands from the State after payment of current taxes to the local treasurer, to the exclusion of the would-be purchaser's making such payment, thereby placing him in the attitude of having made a voluntary payment of such current taxes, of which payment he could derive no benefit. These cases do not intimate that there is a necessity of payment to the local authorities. A man desiring to purchase state tax lands can ascertain the amount of current taxes due before making his application to purchase, and either by producing a statement that shall be satisfactory evidence to the auditor general of the amount of such taxes, or by conveying to the auditor general information that such tax remains unpaid if he cannot procure an official statement that the auditor will recognize, and paying him the amount in addition to the other amounts necessary, as shown by the auditor's records, can secure his legal rights as a would-be purchaser, without being subjected to any risks whatever. This was not done in this case. Either Keith was unaware that there was an unreturned tax that was a lien, or he was disposed to disregard the provision of section 84, through a misconception of the law. It makes little difference which. He did not offer to pay that tax, and his application was insufficient. It was not given life and effect by the subsequent payment of the tax by complainant's brother, and the deed should not have issued, as Mrs. Wilkin's application had intervened. Without further application, the auditor general permitted Keith to have the deed, although he had received the tax of 1893, and had notice that all other taxes had been paid by the complainant. It may be said that the auditor could not lawfully deed to Wilkin, because he had no knowledge that the 1896 tax had been paid. If this is so, it is equally true that he could not lawfully deed to Keith, for the same reason. Complainant had a right to pay all of these taxes, and afterwards to purchase the State's title by paying the amount of the State bid and charges. She did pay these taxes, and caused the necessary sum to be sent to the auditor

general to pay the State bid and charges, with an application for a deed.    This cut off Keith from acquiring a right to purchase under a new application, and we have already seen that the first one was futile, because of the outstanding tax of 1896, which he did not provide for.    We find, then, that the auditor issued a deed without authority, and that the complainant was entitled to one under the then existing state of facts, when the same should be satisfactorily established.    It may be that the auditor general was justified in withholding a deed from her until proper proofs were filed, but his authority to make a valid deed to Keith was cut off by the existing facts, whether they had come to his knowledge or not.

It may be said that the complainant has mistaken her remedy, and should have applied to the auditor general to cancel his deed, under the cases of *Wood* v. *Bigelow*, 115 Mich. 123; *Kneeland* v. *Wood*, 117 Mich. 174.    We think section 98, as construed in these cases, has application to the sale and deed upon delinquent sale, and not to the auditor's deed for state lands, made under the circumstances of this case.

The decree of the circuit court is affirmed, with costs.

The other Justices concurred.